J-S69001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.Y.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2106 EDA 2019 |

Appeal from the Decree Entered July 1, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000128-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: C.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2107 EDA 2019 |

Appeal from the Order Entered July 1, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000333-2014

BEFORE:   SHOGAN, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY SHOGAN, J.:                **FILED FEBRUARY 13, 2020**

D.B. ("Father") appeals from the July 1, 2019 decree involuntarily

terminating his parental rights to his daughter, C.Y.B. ("Child"), born in June

_____

[*] Retired Senior Judge assigned to the Superior Court.

J-S69001-19

2010, pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and he appeals from the July 1, 2019 order changing Child's permanency goal to adoption pursuant to 42 Pa.C.S. § 6351.[1]

The trial court set forth the relevant facts and procedural history of this matter as follows:

In September, 2013, In-Home Protective Services ("IHPS") were implemented to address Child's developmental [needs] and to ensure her safety …. IHPS were subsequently discharged later that year. On February 7, 2014, the Domestic Relations Branch of Philadelphia Family Court confirmed … custody of Child to Father. [The Department of Human Services ("DHS")] originally became involved with this family on October 30, 2017, when DHS received a General Protective Services ("GPS") report alleging that Father and Child resided in a shelter; Father had been missing since 3:00 P.M. that day; Father was supposed to be at the shelter at 3:00 P.M.; the family was registered as a single father household; Child has an adult sister ("Sister") who was not listed as an emergency contact on shelter documents; Sister [appeared] at the shelter and DHS needed authorization to place Child in the care of Sister; Child has previously been diagnosed with Down Syndrome; this was the first time that Father had left Child alone at the shelter; Father may have drug and alcohol issues; Father recently started work remodeling houses and doing construction, but always returned to the shelter [on] time. This report was determined to be valid. On October 31, 2017, DHS visited the home of Sister. DHS learned that Child was released from the shelter to Sister's care. DHS subsequently conducted a home assessment and

_____

[1] On July 22, 2019, Father properly filed separate appeals from the decree and from the order. **See Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018) (requiring the filing of separate notices of appeal where more than one order resolves the issue, arises on more than one docket, or relates to more than one judgment) (citing Pa.R.A.P. 341). On August 7, 2019, this Court consolidated the appeals *sua sponte* pursuant to Pa.R.A.P. 513. Additionally, we note that the same day the decree and order were entered, July 1, 2019, the court terminated the parental rights of M.F. ("Mother") pursuant to 23 Pa.C.S. § (a)(1), (2), and (b). Mother has not appealed and is not a party to the instant appeal.

- 2 -

determined that the home was appropriate and Child was safe in Sister's care. Sister informed DHS that she had not spoken to Father and did not know his whereabouts. DHS created a safety plan with Sister as the safety provider.

On November 2, 2017, Father appeared at Child's school looking for her. The school informed Father that Sister did not bring Child to school that day. Father subsequently visited Sister's home, but Sister did not answer the door. Father then spoke with DHS via telephone and DHS instructed Father to visit DHS. On that same date, Father visited DHS and reported that he was incarcerated in New Jersey on October 30, 2017, and was released on November 2, 2017. DHS asked for documentation regarding Father's arrest and detention, but Father was unable to provide any documentation. On that same date, Child returned to Father's care at the shelter where they had been residing. DHS created a safety plan with Father and the shelter staff, which indicated that Father was not to leave Child unattended and that he would provide appropriate supervision for Child.

On November 15, 2017, DHS received a phone call from Sister, who stated that she was notified that Father was not at the shelter to receive Child when she got off the school bus that day. Sister subsequently went to the shelter and retrieved Child. The shelter staff stated that Father did not call and was not at the shelter when Sister arrived to retrieve Child. DHS arrived at the shelter at approximately 6:00 P.M. and spoke with Father, who had recently arrived at the shelter. Father could not provide an explanation or documentation as to why he was not at the shelter to receive Child when she got off the school bus that day. DHS determined that Father violated the safety plan. On that same date, DHS obtained an Order of Protective Custody ("OPC") for Child and placed her with Sister, where she currently remains.

On November 17, 2017, a shelter care hearing was held for Child. Father was present for this hearing. The trial court lifted the OPC and ordered that the temporary commitment of Child to DHS to stand. On November 20, 2017, DHS filed a dependency petition for Child.

On November 22, 2017, the trial court adjudicated Child dependent based on present inability to provide proper parental care and control. Father was not present for this hearing. The trial court discharged the temporary commitment to DHS and

committed Child to the custody of DHS. Father was referred to the Clinical Evaluation Unit ("CEU") for a full drug and alcohol screen, dual diagnosis assessment, and three random drug screens. Father was also referred to the Achieving Reunification Center ("ARC") for appropriate services. Additionally, the trial court ordered Father to comply with all single case plans, objectives, and recommendations, as well as attend supervised visitation with Child at the agency and Father was to confirm visitation 24 hours in advance of the schedule[d] visit. The trial court issued a stay-away order against Father as to Child's school and Sister's home.

On February 5, 2018, Community Umbrella Agency ("CUA") Turning Points for Children held an initial Single Case Plan ("SCP") meeting. Father's parental objectives were to address his drug and alcohol issues; complete three random drug screens prior to the next court date; undergo a CEU dual diagnosis assessment prior to the next court date and follow all recommendations; explore appropriate housing options; attend ARC, once referred; comply with all CUA case management and court-ordered services; continue parenting education classes at Career Link; comply with the stay-away orders as to Child's [s]chool and Sister's home; and confirm supervised visitation 24 hours in advance of the scheduled visit.

A permanency review hearing was held for Child on February 12, 2018. Father was present for this hearing. The trial court determined that Father was moderately compliant with the permanency plan. Father completed a parenting course through CUA. The trial court found that Child's placement continued to be necessary and appropriate and that Child remain as committed. Father was referred to the CEU for a forthwith drug screen and three random drug screens.

A permanency review hearing was held for Child on May 23, 2018. Father was present for this hearing. The trial court determined that Father was moderately compliant with the permanency plan. The trial court also found that Father tested positive for cocaine on April 26, 2018, and Father failed to attend five of the 18 offered supervised visits with Child. The trial court determined that Child's placement continued to be necessary and appropriate and that Child remain as committed. Father was referred to the CEU for a forthwith full drug and alcohol screen, dual diagnosis assessment, monitoring, and three random drug screens. Additionally, Father was referred to the Behavioral Health System ("BHS") for

consultation and/or evaluation. The stay-away order as to Father was ordered to stand. Father's visitation remained the same but was permitted to attend a special birthday visit for Child.

On July 3, 2018, CUA revised the SCP. Child's alternative/concurrent permanency plan was identified as adoption. Father's parental objectives remained predominantly the same.

A permanency review hearing was held for Child on August 20, 2018. Father was not present for this hearing. The trial court determined that Father was non-compliant with the permanency plan and Child's concurrent placement plan was identified as adoption. The trial court learned that Father tested positive for cocaine at the forthwith drug screen on May 23, 2018. The trial court found that Child's placement continued to be necessary and appropriate and that Child remain as committed. Father was re-referred to the CEU for a forthwith drug screen, monitoring, and three random drug screens. Additionally, the trial court suspended Father's visitation with Child.

A permanency review hearing was held for Child on October 30, 2018. Father was not present for this hearing. The trial court determined that Father was non-compliant with the permanency plan. The trial court found that Child's placement continued to be necessary and appropriate and that Child remain as committed. Father was referred to the CEU for a forthwith drug screen, a dual diagnosis assessment, monitoring, and three random drug screens.

A status review hearing was held for Child on January 31, 2019. Father was not present for this hearing. The trial court ordered all prior orders to stand. If Father availed himself, Father was to be referred to the CEU for a forthwith drug screen, a dual diagnosis assessment, and three random drug screens.

Child has been adjudicated dependent since November 22, 2017. Father has failed to consistently comply with his objectives and comply with court orders throughout the life of the case. DHS filed petitions to involuntarily terminate Father's parental rights and change Child's permanency goal from reunification to adoption on February 26, 2019.

A permanency review hearing was held for Child on March 31, 2019. Father was present for this hearing. The trial court determined that Father was non-compliant with the permanency plan. Father indicated that he was residing at a recovery house. The trial court found that Child's placement continued to be necessary and appropriate and that Child remain as committed. Father was referred to the CEU for a forthwith full drug and alcohol screen, assessment, and three random drug screens. Father was also referred to BHS for monitoring. Father was ordered to provide a full progress report, treatment plan, and attendance. Father was also ordered to comply with the stay away order.

On May 9, 2019, the trial court started the termination and goal change trial for Child. Father was present for this hearing. John Capaldi, Esq. was appointed as Child's special legal counsel ("Legal Counsel") and made representations regarding Child's wishes. The trial court heard testimony for the termination and goal change …. Although Father indicated he did not want to [voluntarily relinquish his parental rights], Father was granted [the] opportunity to [defer voluntarily relinquishing his parental rights] until May 23, 2019. The trial court closed the record and ordered all parties to return to court for a decision only on July 1, 2019. (N.T. 05/09/19, pgs. 50-51).

On July 1, 2019, the trial court completed the termination and goal change trial for Child. Father was present. The trial court found clear and convincing evidence to change the permanency goal to adoption and to involuntarily terminate Father's parental rights under 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8), and (b). (N.T. 07/01/19, pgs. 7-8).

Trial Court Opinion, 9/19/19, at 1-5 (footnotes omitted).[2]  On July 22, 2019,

Father filed a timely appeal and statement of errors complained of on appeal

pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

---

[2] On November 16, 2017, the trial court appointed the Defender Association of the Philadelphia Child Advocate Unit as guardian *ad litem* ("GAL").  At the May 9, 2019 and July 1, 2019 hearings, Elizabeth Flanagan, Esquire, represented Child's best interests as GAL; John Capaldi, Esquire, represented

On appeal, Father raises the following issues for our review:

1. [Did t]he trial court [commit] an error of law and abuse of discretion by changing the permanency goal from reunification to adoption where [DHS] failed to provide sufficient evidence that such a goal change would be best suited for [Child's] needs and welfare[?]

2. [Did t]he trial court [commit] an error of law and abuse of discretion by involuntarily terminating [Father's] parental rights under 23 Pa.C.S. § 2511(a), where the evidence showed that [Father] substantially complied with the family service plan goals established by [DHS?]

3. [Did t]he trial court [commit] an error of law and abuse of discretion by involuntarily terminating [Father's] parental rights under 23 Pa.C.S. § 2511(a) and (b), where [DHS] failed to prove by clear and convincing evidence that involuntary[il]y terminating [Father's] parental rights would best serve the emotional needs and welfare of [Child?]

**See** Father's Brief at 9.[3]

In his first issue, Father asserts that the trial court erred and abused its discretion by changing Child's permanency goal from reunification to adoption. Appellant's Brief at 9. However, we are constrained to conclude that Father waived this issue because he has failed to discuss this issue in any meaningful manner or cite to any authority to support this claim of error. **In re W.H.**, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) ("[W]here an appellate brief fails to

---

Child's legal interests. **See In Re Adoption of L.B.M.**, 161 A.3d 172, 180 (Pa. 2017) (holding that the trial court must appoint counsel to represent the legal interests of any child involved in a contested involuntary termination proceeding pursuant to 23 Pa.C.S. § 2313(a)).

[3] For purposes of our review, we have renumbered Father's issues on appeal.

provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

In Father's second issue, he avers that the trial court erred and abused its discretion by involuntarily terminating Father's parental rights under Section 2511(a), because he substantially complied with the family service plan. Father's Brief at 9. We review cases involving the involuntary termination of parental rights according to the following standard:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted). Termination requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The relevant subsections of 23 Pa.C.S. § 2511 provide as follows:

**(a)   General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).

The trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). We have long held that in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.,* 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc)*. Herein, we focus our analysis on 23 Pa.C.S. § 2511(a)(2) and (b).

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes

of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In Interest of Lilley***, 719 A.2d 327, 330 (Pa. Super. 1998). The grounds for termination are not limited to affirmative misconduct; they concern parental incapacity that cannot be remedied. ***In re Z.P.***, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. ***Id.***

Father argues that he might not have achieved his goals, but he made significant progress toward achieving them, including completing parenting and financial counseling, finding employment, and working on making a safe home for Child. Father's Brief at 18. Father contends that he did not refuse to enter drug treatment; he was not able to complete it. ***Id.*** Father argues he was committed to sobriety but "lacked the time" because he had allegedly prioritized renovating the home where his daughter would live. ***Id.***

The record belies Father's arguments. The record reflects that Dawn Ross was assigned as Case Manager in November of 2017. N.T., 5/9/19, at 5. Ms. Ross testified that the case was originally opened after Father left Child alone at a homeless shelter. ***Id.*** at 5-6. Ms. Ross participated in the single case plan meeting with Father. ***Id.*** at 7-8. From the beginning of the case, Father's objectives were to address his mental health and drug and alcohol issues, and enroll in a drug and alcohol treatment program, follow all recommendations, explore housing options, and comply with court-ordered services and stay-away orders. ***Id.*** at 8.

As of the date of the termination/permanency hearing, Father had not provided treatment verification and had not given CEU consent to monitor his treatment progress. N.T., 5/9/19, at 10-11. Father was not at that time engaged in any program because he had been terminated from the program after missing curfew. *Id.* at 11-12. Father did comply with the stay-away order, although there were still concerns that Father was sending threatening messages to Sister by means of a family member. *Id.* at 12, 25-26. However, there was no direct evidence of this. *Id.* at 30.

Ms. Ross described Father's compliance with his objectives as "minimal." N.T., 5/9/19, at 12. Reunification was not an option because Father had no housing, was inconsistent with his mental health and drug and alcohol rehabilitation, and Father's only employment was sporadic and working "under the table" as a contractor. *Id.* at 13-14. Father could not report a steady and stable income, work hours, or pay stubs. *Id.* Father was consistently non-compliant and had multiple positive drug screens for cocaine throughout the history of the case. *Id.* at 23-24. Father had monthly supervised visitation with Child for a time, but the visits were suspended for non-compliance in August of 2018, due to a "grave threat," following an altercation between Father and Sister. *Id.* at 35-36. Specifically, the grave threat was the result of an incident where Sister was holding Child, and Father knocked Child to the ground. *Id.* at 36. Prior to the August 2018 incident, Father's last visit had been in April 2018. *Id.*

Father testified that he currently had housing with room for Child. N.T., 5/9/19, at 37. Father testified that he had been working as a contractor in Maryland and Coatesville. *Id.* at 41-42. When asked why he was not in a drug-treatment program, Father stated he was expelled from the program. *Id.* at 38. Father asserted that his expulsion resulted from being held responsible for the behavior of two other men in the house, who he had hired for a contractor's job, and who were late for curfew. *Id.* at 38-39. Father stated he did not enroll in another program because he did not have the time to attend it. *Id.* at 39. The last time he attended a program was in March of 2019 for one week. *Id.* at 40-43.

As evidenced above, Father was aware from the beginning of the case that achieving sobriety and entering drug treatment was a prerequisite to reunification. After each court hearing, Father either consistently tested positive for cocaine or was ordered to once more attend a clinical evaluation. There is no evidence that Father took sobriety seriously; his only documented attempt at treatment was in March of 2019, well over one year after Child was committed to DHS custody. As noted, Father was discharged from that program after only one week due to missing curfew, and rather than taking responsibility for his discharge, Father offered only vague excuses.

Moreover, Father's sobriety was not the only parental incapacity preventing him from achieving reunification with Child. Father was ordered to attend supervised visitation with Child, but those visits were suspended in

- 13 -

August of 2018 following a violent altercation with Sister. The trial court observed:

> Child needs permanency and Father has demonstrated that he is unwilling to provide Child with essential parental care, control or subsistence necessary for her physical and mental well-being. Father has refused to remedy the conditions and causes of Father's incapacity. Father has participated in SCP meetings with CUA and has attended numerous hearings throughout the life of the case, so Father is aware of his objectives. Father had ample opportunity to put himself in a position to parent. Father's repeated and continued incapacity has not been mitigated.

Trial Court Opinion, 9/19/19, at 10 (internal citations omitted).

After review, we agree with the trial court. We discern no error in the trial court's finding that clear and convincing evidence supported the termination of Father's parental rights pursuant to Section 2511(a)(2). Father's continued incapacity due to his inability to complete court-ordered drug treatment and screening or to maintain a relationship with Child through visitation has resulted in Child being without essential parental care, the cause of which "cannot or will not be remedied." *Lilley*, 719 A.2d at 330; *Z.P.*, 994 A.2d at 1117.

In Father's third issue, he alleges that the trial court erred and abused its discretion when it concluded that terminating Father's parental rights would best serve the emotional needs and welfare of Child under Section 2511(b). Father's Brief at 9. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Z.P.*, 994 A.2d at

- 14 -

1121. The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.*

We have stated:

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Z.P.*, 994 A.2d at 1121 (quoting *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Additionally, the court may emphasize the safety needs of a child. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008). "[A] parent's basic constitutional right to the custody and rearing of . . . [his] child is converted, upon the failure to fulfill . . . [his] parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Father avers DHS did not prove by clear and convincing evidence that severance of the parent-child bond would not cause lasting and irreparable harm to Child. Father's Brief at 19-20. Father argues that prior to Child's removal, he was the sole support for Child. *Id.* Father asserts Child could not address her feelings about permanency due to alleged cognitive limitations. *Id.*

Again, Father's arguments are belied by the record. Ms. Ross did not believe that Child would suffer any irreparable harm if Father's parental rights were terminated. N.T., 5/9/19, at 15-16. Child is very affectionate with Sister and looks to her for her day-to-day needs and concerns. *Id.* at 15-16. Sister helped Child receive additional tutoring services at school and has been instrumental in keeping Child up to date with special dental needs. *Id.* at 26-27. Child has a parental bond with Sister. *Id.* at 24. Child knows who Father is, and they are affectionate with each other; however, she is affectionate toward most people. *Id.* at 15, 30-31. Ms. Ross agreed it was in Child's best interest for her goal to be changed to adoption. *Id.* at 22.

Attorney Capaldi stated that he met with Child at Sister's home. N.T., 5/9/19, at 45-46. There are two other female children residing in the home, and they were playing on the front porch with Child. *Id.* at 45. Child shares a bedroom with the two other girls. *Id.* at 46. Child indicated that she likes the home very much and would like to stay there; when asked about contact with Mother and Father, Child smiled and indicated she liked that as well. *Id.*

at 46-47. Attorney Capaldi did not believe Child appreciated the consequences of permanency goal changes and adoptions. *Id.* at 47. However, Child articulated that she was safe, happy, well taken care of, liked her school, and wished to stay in the home with Sister. *Id.* The trial court concluded that Attorney Capaldi was credible. Trial Court Opinion, 9/19/19, at 18.

As noted above, DHS is not required to present expert testimony, but may rely on the impressions of social workers regarding the irreparable harm potentially caused to Child. *Z.P.*, 994 A.2d at 1121. Additionally, where there is no evidence of a bond in the record, it is reasonable to assume no bond exists. *K.Z.S.*, 946 A.2d at 763.

As discussed above, there was no evidence reflecting a parental bond between Father and Child. Although there was evidence introduced that Child was affectionate toward Father, it appears from the record, that Child is affectionate generally. The evidence reflected that Child looks to Sister for her daily needs, and shares a parental bond with her. Additionally, Sister provides a safe and loving home for Child, and Sister takes care of Child's personal, educational, and medical needs. We agree with the trial court that Child would not suffer irreparable harm from the termination of Father's parental rights, and that it was in Child's best interests to be adopted by Sister. Trial Court Opinion, 9/19/19, at 18.

For the reason set forth above, we conclude that there was clear and convincing evidence supporting the trial court's termination of Father's

parental rights under Section 2511(a)(2). Additionally, we conclude that there was no error of law or abuse of discretion in the trial court's finding that termination was in Child's best interests under Section 2511(b). **Z.P.**, 994 A.2d at 1126-27; **K.Z.S.**, 946 A.2d at 763.

Decree involuntarily terminating Father's parental rights affirmed. Order changing Child's placement goal to adoption affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/13/20